UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>BRIAN WINSTON BAILEY,<br><br>Defendant. | Criminal Action No. 19-156-1 (CKK) |

MEMORANDUM OPINION
(February 21, 2023)

A jury convicted Defendant Brian Bailey ("Defendant" or "Bailey") of, among other things, conspiracy in violation of 18 U.S.C. § 371 and bribery in violation of 18 U.S.C. § 201(b)(1)(C).  In his pending [254] Renewed Motion for Judgment of Acquittal or, in the Alternative, for New Trial, Bailey mainly challenges his convictions for conspiring with Dawne Dorsey to unlawfully obtain confidential government records known as Tenant Opportunity to Purchase Act ("TOPA") Notices ahead of his competition and with access to information that might otherwise be redacted from public disclosure.  He raises four main arguments:  (1) section 201(b)(1)(C) is unconstitutionally vague; (2) that he is actually innocent on his section 201(b)(1)(C) conviction because he did not induce Dorsey to violate a *lawful* duty; (3) that the Government constructively varied from or amended the indictment; and, probably in the alternative, (4) the evidence was insufficient to show any duty existed in the first place.[1]  Each argument fails.

---

[1] Defendant does not appear to raise any argument in favor of acquittal or a new trial as to any charge, so the Court does not address any such unadvanced issues.

1

Accordingly, and upon consideration of the briefing,[2] the relevant legal authorities, and the entire record, Defendant's [254] Renewed Motion for Judgment of Acquittal or, in the Alternative, for New Trial is **DENIED**.

## I.   BACKGROUND

A jury convicted Defendant of four counts arising from two related conspiracies: (1) the conspiracy between Bailey and Dorsey, and (2) a conspiracy between Bailey and co-defendant David Paitsel where Bailey paid Paitsel for tenant contact information only available to Paitsel by virtue of his position as a Federal Bureau of Investigation ("FBI") employee. Bailey explained the pecuniary benefit of these two conspiracies to potential partners in one particularly incriminating email in evidence. Gov. Ex. 103C. The District of Columbia, in Bailey's words, "is unique to any other jurisdiction in the country in that every tenant [who is] renting a residence has [a] 'right of [first] refusal' to purchase the property they live in" when their landlord puts the property up for sale. *Id.* This process is governed by the District of Columbia's "Tenant Opportunity to Purchase Act" ("TOPA"), codified at D.C. Code § 42-3404. If a tenant can match the landlord's "bona fide offer of sale," the landlord must sell the building to the tenant. *Id.* 42-404.02(a). By acquiring these rights, and acquiring them as early as possible, Bailey earned the opportunity "to purchase the [property], match or re-negotiate the

---

[2] The Court's consideration has focused on:
- Defendant's Renewed Motion for Judgment of Acquittal or, in the Alternative, for a New Trial, ECF No. 254 ("Motion" or "Mot.");
- The Government's Opposition to Defendant Bailey's Renewed Motion for Judgement [sic] of Aquittal [sic] or, Motion for a New Trial, ECF No. 258 ("Opp.");
- Defendant's Reply in Support of Renewed Motion for Judgment of Acquittal or, in the Alternative, for a New Trial, ECF No. 261 ("Repl."); and
- Trial Transcripts, ECF Nos. 249-253 ("Trial Trans.").

In an exercise of its discretion, the Court has concluded that oral argument would not be helpful in the resolution of the Motion.

contract[,] and then sell [Bailey's newfound rights] to purchase the property to another investor without actually taking title to the property." Gov. Ex. 103C. "The difference between the contract price and the premium amount that an investor is willing to pay is the margin of profit that's left over." *Id.*

Bailey could only purchase these rights, however, if (1) he knew a property was for sale and (2) he could contact the tenants to buy their TOPA rights. As a result, he began to pay Dorsey, usually in cash, for unredacted TOPA "notices," also termed "offers of sale." Pursuant to TOPA, a landlord must first "provide each tenant a written copy of the offer of sale" and, after doing so, "provide the [District of Columbia Department of Housing and Community Development ("DHCD")] with a written copy of the offer of sale" along with a certification that "each tenant [was] provided [a] cop[y] of the offer of sale on the same day." D.C. Code § 42-3404.03. As a DHCD employee, Dorsey had immediate access to these notices as soon as they were provided to DHCD. *See* Trial Trans. 9/28/22 at 136-37. As such, Bailey paid Dorsey to give him these notices as soon as possible. Gov. Ex. 102B. In an email to Dorsey, for example, Bailey complained that Dorsey was not sending notices fast enough. *Id.* As he remonstrated her, "[y]ou [Dorsey] sending files isn't working out the way I [Bailey] thought it would. Initially I was getting files almost daily. Now I'm receiving files 2 or 3 times a month." *Id.* For Bailey, that would not do. In his words, "[t]he [TOPA notices] are time sensitive and most of the time I get them so late that I might only have a week or less to react . . . It doesn't do me [Bailey] any good to receive the files with almost no time to react." *Id.*

At trial, the Government argued, and the jury found, that Bailey paid Dorsey to give him these files in violation of Dorsey's duty to otherwise keep them from Bailey. The Government relied almost entirely (if not entirely) on a DHCD policy to keep TOPA notices confidential from

uninterested third parties, except in a response to a request under the District of Columbia's Freedom of Information Act ("FOIA"). Trial Trans. 9/28/22 at 68, 128. Although memorialized in certain exhibits (with Dorsey copied), *e.g.*, Gov. Ex. 110B, it was conveyed orally from supervisors to Dorsey (and other DHCD employees), Trial. Trans. 9/28/22 at 137-142.

The Government presented overwhelming evidence of Bailey's corrupt intent to induce Dorsey to violate what he understood to be Dorsey's obligation to keep these TOPA notices confidential. The Government introduced thousands of communications between Bailey and Dorsey memorializing and/or effectuating their corrupt bargain. For example, Exhibit 3B contained thousands of text messages between Bailey and Dorsey and hundreds of messages from Dorsey promising, conveying, or requesting TOPA notices in exchange for cash or check. *E.g.*, Text 470[3] ("I [Dorsey] will review your [Bailey's] request for documents on 211 Morgan Street NW] once I get in [to the office]"); Text 267 ("I'm about to email the notices"); Text 529 (in response to Bailey telling Dorsey that he would "give [her] cash" after Dorsey did not "cash [her] check," Dorsey confirming "ok[,] [w]hat time do you [Bailey] want me [Dorsey] to come" to Bailey's house). Exhibit 101A contained an email with the subject line "RE: TOPA Notice" from Dorsey to Bailey informing Bailey "[j]ust a heads up, you will receive multiple emails from me." In Exhibit 101F, which contained multiple TOPA notices, Dorsey told Bailey, "I just tried sending it [the TOPA notices] from my personal email. Let me know if it came through. The email address is [redacted]."

Exhibit 102A contains emails between Bailey and Dorsey in which Bailey told Dorsey that he "could give you [Dorsey] [$]10,000" for TOPA notice and similar documents. *Id.* at 2.

---

[3] The exhibit assigns each text message a number, so the Court cites to each message by number for ease of reference.

Dorsey assured Bailey that she has furtively asked another government agency to "check their records." *Id.* In Exhibit 102B, Bailey complained to Dorsey that Dorsey had not been sending Bailey requested notices quickly enough. Dorsey responded, "I understand what you're saying . . . I've been trying to send them as we got them . . . ." Dorsey responded to a similar complaint from Bailey in Exhibit 102, assuring him that she "does apologize" to him because she "didn't realize that the files [she] was sending were late." *Id.* Finally, Exhibit 106A featured another email in which Dorsey sent Bailey several TOPA notices. She provided additional contact information for tenants at one other property in addition to the property's sale price.

A variety of exhibits further establish Bailey's mental state that he understood Dorsey was doing something unlawful by sending him TOPA notices. For example, when Bailey emailed an associate TOPA notices that Bailey received from Dorsey, Bailey told the associate: "Keep this quiet. We're not supposed to have it." Gov. Ex. 103D. When Dorsey warned Bailey that "there's supposed to be a group of people trying to investigate [Dorsey and her coworkers] b[e]c[ause] they think [DHCD] [is] leaking info," Bailey responded, "Ok...the focus is on everyone. Nothing can lead back 2 u right?" Gov. Ex. 3B. Moreover, each of Bailey's payments to Dorsey was furtive—either he went "down to DHCD to slide his [friend] an envelope," Gov. Ex. 101E, or Dorsey went to Bailey's home for cash or checks, *e.g.*, Gov. Ex. 3B.

Consistent with the facts in evidence, the Court instructed the jury that, to convict Bailey of bribing Dorsey in violation of section 201(b)(1)(C) bribery, the Government must show the following beyond a reasonable doubt: (1) Bailey gave, offered, or promised something of value to Dorsey; (2) Dorsey was a public official; (3) Bailey did so corruptly; and (4) Dorsey had a "lawful duty" to keep confidential the information and/or material for which Bailey paid Dorsey.

5

The Court defined lawful duty as "any statutory, regulatory, or official duty imposed upon and made known to Ms. Dorsey, either orally or in writing, by virtue of and specific to her position as Program Specialist at" DHCD. In all material respects, the Court gave the jury the instruction requested by Defendant. Based on this instruction, the jury found Defendant guilty of bribing Dorsey in violation of 18 U.S.C. § 201(b)(1)(C).

## II. LEGAL STANDARDS

Rule 29(a) of the Federal Rules of Criminal Procedure provides in pertinent part that "[a]fter the government closes its evidence or after the close of all the evidence, the court on defendant's motion must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction." "In ruling on a motion for a judgment of acquittal, the trial court must view the evidence in the light most favorable to the Government[,] giving full play to the right of the jury to determine credibility, weigh the evidence[,] and draw justifiable inferences of fact." *United States v. Treadwell*, 760 F.2d 337, 333 (D.C. Cir. 1985) (citation omitted). "This stringent standard contemplates that the ultimate decision of guilty or innocence should be left to the jury, and that it is the province of the jury to credit certain testimony and reject other testimony." *United States v. Khanu*, 675 F. Supp. 2d 55, 60 (D.D.C. 2009). "[A] judgment of acquittal is appropriate only when there is *no* evidence upon which a reasonable juror might fairly conclude guilty beyond a reasonable doubt." *United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983) (emphasis original). Argument that the evidence is legally insufficient to warrant conviction is appropriately raised on a Rule 29 motion for a judgment of acquittal. *See United States v. Reffitt*, 602 F. Supp. 3d 85, 95 (D.D.C. 2022).

Under Federal Rule of Criminal Procedure 33(a), the Court "may vacate any judgment and grant a new judgment if the interest of justice so requires." Granting a new trial "is

warranted only in those limited circumstances where a serious miscarriage of justice may have occurred." *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (cleaned up).  The Court has "broad discretion" in deciding a motion for a new trial.  *Id.*  The party seeking a new trial bears the burden of proving that it is justified.  *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982).

### III.   DISCUSSION

**A.  Section 201(b)(1)(C)**

Federal criminal law's most expansive bribery statute is 18 U.S.C. § 201.  *See McDonnell v. United States*, 579 U.S. 550, 561 (2016).  It criminalizes several forms of bribery, including, among others, a *quid pro quo* to defraud the United States, § 201(b)(1)(B), and a *quid pro quo* to influence a witness's "testimony under oath" at a "trial, hearing, or other proceeding," § 201(b)(4).  Most commonly charged is section 201(b)(1)(A), which criminalizes corruptly giving anything of value to a public official with the intent to influence any official act, *see United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002), which the Court in prior orders has termed "official-act bribery."  As multiple Circuits have explained, the provision charged here, section 201(b)(1)(C), is a distinct offense, which this Court has termed "lawful-duty bribery."  *E.g.*, *Valdes v. United States*, 475 F.3d 1319, 1327 (D.C. Cir. 2007) (en banc) (characterizing lawful-duty bribery as covering an "*additional* predicate class[]" of conduct (emphasis original)).[4]  Unlike official-act bribery, lawful-duty bribery bars inducing a public official "to do or omit to do any act in violation of the lawful duty of such official."  18 U.S.C. § 201(b)(1)(C).

---

[4] *Accord Alfisi*, 308 F.3d at 152 n.3; *United States v. Young*, 651 F. App'x 202, 204 (4th Cir. 2016); *United States v. Fernandez*, No. 19-15044, 2022 WL 3581793, at *4 (11th Cir. Aug. 22, 2022) (unpublished).  *Cf. also United States v. Leyva*, 282 F.3d 623, 625 (9th Cir. 2002) (distinguishing section 201(b)(2)(B), which criminalizes a *quid pro quo* for fraud, with sections 201(b)(1)(A) and (b)(1)(C), which have "'official act' or 'official duty' language").

7

*Valdes*, and the canon against surplusage more generally, teaches that each distinct offense should be read to encompass a different class of predicate conduct lest one offense be rendered surplusage.  475 F.3d at 323.  As the Eleventh Circuit has explained, treating each subpart of section 201 as substantially identical "is wrong," because, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely."  *Fernandez*, 2022 WL 3581793, at *4 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

Applying *Valdes*, binding appellate authority, the Court concluded lawful-duty bribery added a factual predicate necessary for conviction that is not included in official-act bribery.  On similar grounds, the Court rejected the Government's argument that "lawful duty" modifies the offense's mental state, rather than mandating a factual predicate.  As the Court explained,

> Taking this reading to its logical conclusion, it is clear why the Government's position is not correct: *Every* person who *corruptly* bribes a public official does so assuming that, to receive what they want, the public official must do something unlawful. *See United States v. Ring*, 706 F.3d 460, 470 (D.C. Cir. 2013) (noting same expression of mental state in different bribery statute).  If "lawful duty" modifies the mental state required, then Congress created a bribery statute governing *all* bribery of public officials no matter the circumstances and buried it in a subsection. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress "does not . . .hide elephants in mouseholes."). Courts are not to read criminal statutes in such a way, nor are courts to read subsections of criminal statutes to simply repeat the same offense in two subsections, even if there is substantial overlap." *See United States v. Aguilar*, 515 U.S. 593, 616 (1995) (Scalia, J., concurring).

Order, ECF No. 208 at 3 (Sept. 20, 2022).  At Defendant's request, and because the Court and the parties were unaware of any other court having previously defined "lawful duty," the Court proceed to fashion a definition itself.

The Court did so, as it must, by beginning with the language of the statute and following the D.C. Circuit's instruction that, when a bribery statute "'can be linguistically be interpreted to be either a meat axe or a scalpel, [it should] reasonably be taken to be the latter.'"  *Id.* at 4

8

(quoting *Valdes*, 475 F.3d at 1323). After considering dictionary definitions and grammatical canons of construction, the Court defined "lawful duty" to "encompass statutory, regulatory, or official duties imposed upon the person receiving the bribe, either orally or in writing, by virtue of and specific to the office stewarded by the person receiving [or offered] the bribe." Order, ECF No. 201 at 5 (Sept. 17, 2022).

### B. Vagueness

Despite requesting a substantially identical instruction during trial, Defendant now argues that section 201(b)(1)(C) is unconstitutionally vague. It is not.

A law is vague when "it fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). "[T]he touchstone is whether the statute, standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997). "This is 'a stringent standard.'" *United States v. Grider*, --- F. Supp. 3d --- 2022 WL 3016775, at *7 (D.D.C. 2022) (CKK) (quoting *United States v. Sandlin*, 575 F. Supp. 3d 16, 30 (D.D.C. 2021)). A vagueness challenge cannot succeed where the standard is "imprecise but comprehensible[,] whose satisfaction may vary dependent upon whom you ask." *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017). Rather, the statute must "specify no standard of conduct at all." *Id.* (cleaned up). Moreover, a criminal statute is not unconstitutionally vague on its face (which appears to be Defendant's challenge) unless it is "impermissibly vague in all of its applications." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 479, 497 (1982).

To determine if "lawful duty" renders the statute unconstitutionally vague, the Court must look to the meaning of the term in context, as well as any "judicial gloss" the Court may

9

apply to provide "clarity at the requisite level." *See Lanier*, 520 U.S. at 266. Because Congress did not supply a definition, the Court looked to its "common or popular meaning[]." *See United States v. North*, 910 F.2d 843, 881 (D.C. Cir. 1990) (interpreting "corruptly" mens rea) *superseded in irrelevant part on rehr'g* 920 F.2d 990 (D.C. Cir. 1990). The Court previously began, and begins again here, with dictionary definitions.

A "duty" is "a legal obligation that is owed . . . and that needs to be satisfied." *Duty*, Black's Law Dictionary (9th ed. 2009). Similarly, a "legal duty" is a "duty arising by contract or by operation of law." *Legal Duty*, Black's Law Dictionary (9th ed. 2009). Insofar as the key word here is not "legal" but "lawful," "lawful" means "[n]ot contrary to law." *Lawful*, Black's Law Dictionary (9th ed. 2009). The Court also turned to general principles of statutory construction. It understood how to define "lawful duty" by also looking at what "lawful duty" is *not*, in other words, by virtue of placing subsection (b)(1)(C) in context. *See United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013) (discussing canon against surplusage). As such, reapplying *Valdes*, "lawful duty" bribery is *not* "official act" bribery as a matter of law. *See* 475 F.3d at 1327; *see also United States v. Alfisi*, 308 F.3d 144, 151 n.3 (2d Cir. 2002) (these two subsections "undoubtedly overlap in some considerable measure, although resort to [official-act bribery] seems most appropriate in the case of bribes regarding decisions involving the exercise of judgment or discretion . . . while the use of [lawful-duty bribery] would be most appropriate in the cases of bribes to induce actions that directly violate a specific duty, such as a prison guard's duty to prevent the smuggling of contraband").

To the extent that lawful-duty bribery could still be read to provide "no standard of conduct at all," the interpretive "grammar canon" provides even further clarity. *See Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1173 (2021) (Alito, J., concurring) (discussing canon). Here,

Congress proscribed bribery to induce an official to act "in violation of *the* lawful duty of such official." 18 U.S.C. § 201(b)(1)(C) (emphasis added). The selection of a definite, rather than indefinite, article is grammatically important. *Cf. Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1481 (2021) (citing The Chicago Manual of Style § 5.7, p. 227 (17th ed. 2017)) (noting importance of indefinite article in separate statutory scheme). Where used as an adjective, and in contrast to an indefinite article (e.g., "a"), which "points to nonspecific objects, things, or persons that are not distinguishable from the other members of a class," a definite article (e.g., "the") speaks to something specific and distinct. *See* The Chicago Manual of Style §§ 5.70-71, 5.75, pp. 166-67 (15th ed. 2003). As such, the lawful-duty bribery section refers to a duty that is that *particular* official's duty, which may or may not be shared with other public officials. Because the actus reus of the crime must relate to *the* duty of the official, there must be some nexus between the office the public official stewards and the legal duty violated (or to be violated).

Moreover, as Defendant readily argues, to the extent that there is some vagueness issue, the Court can avail itself of the constitutional avoidance doctrine. Rep. at 3-4 (citing *Jones v. United States*, 526 U.S. 227, 228 (1999)). The Court effectively did so by requiring that an oral policy be "made known" before characterizing it as a "lawful duty." Were a policy not "made known," the Court reasoned, a jury runs the risk of convicting a defendant where there is neither an extant "duty" nor an extant duty "arising by contract or by operation of law." *See* Order, ECF No. 220 at 4. As the Court put it, a duty must "have in fact been promulgated, and it must be specific to the public official's duties." *Id.* Now, and in the alternative, Defendant would have the Court go further, requiring a policy constituting the "lawful duty" be written. Repl. at 3.

Such an argument, however, faces appellate headwinds. When *Valdes* opined on section 201(b)(1)(C)'s reach, it offered examples of criminal conduct constituting lawful-duty bribery.

11

For example, an Air Force sergeant who "s[old] names of new recruits" violated his "lawful duty." *Id.* (citing *Parks v. United States*, 355 F.2d 167 (5th Cir. 1965)). Similarly, a law enforcement officer who provided "an investigative target with 'information relating to the IRS and FBI's investigations in exchange for money'" violated his "lawful duty." *Id.* (quoting *United States v. Cruz*, 946 F.2d 122, 123 (11th Cir. 1991)). *Valdes* itself mentioned no requirement that a policy be written, and there is no mention in *Cruz* that the law enforcement officer's actions were proscribed by *written* standards of conduct. Rather, *Valdes* and *Cruz* were evidently satisfied that some duty merely existed *in fact*.

Defendant's insistence that a lawful duty must be written is also buffeted by factual headwinds. There were multiple exhibits in evidence memorializing *in writing* the policy that was originally conveyed orally. *E.g.*, Gov. Ex. 110A (email from Dorsey to requestor that they must submit FOIA request); Gov. Ex. 110B (email from Dorsey's supervisor, with Dorsey copied, explaining policy); Gov. Ex. 214 (email from DHCD supervisor to investigator explaining policy). To the extent that Defendant is concerned that the jury returned a verdict based solely on a witness's credibility, those are not the facts here, and a defendant may not rely on hypothetical prosecutions in advancing a vagueness challenge. *See Sandlin*, 575 F. Supp. 3d at 30.

Lastly, Defendant relies on *Lanier*'s broad statement that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." 520 U.S. at 267. As a threshold matter, this admonition is not nearly as potent as Defendant insists. The application of a criminal statute to a novel set of facts does not, in fact, render a statute unconstitutionally vague. The question is not whether the Government has not yet brought its enforcement

discretion to bear, but rather whether a defendant would be convicted "'under a law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.'"  *See Kincaid v. Gov. of D.C.*, 854 F.3d 721, 728-29 (D.C. Cir. 2017) (quoting *Beckles v. United States*, 137 S. Ct. 886, 892 (2017)).  Defendant would have the Court adopt a *per se* rule that the Government must have previously secured a conviction on a similar set of facts for a criminal statute to apply to that class of conduct, an approach that every court of this jurisdiction has rejected in the past two years.  *See United States v. Sheppard*, Crim. A. No. 21-203 (JDB), 2022 WL 17978837, at *4 (D.D.C. Dec. 28, 2022) (reiterating that every court to confront the issue has rejected the argument that 18 U.S.C. § 1512(c) does not apply to insurrection-related offenses merely because the Government had not previously applied it to obstruction of Congressional proceedings).

In any event, the argument also rests on a mistaken factual premise—the Government has secured at least two convictions for lawful-duty bribery in the recent past without requiring evidence of a written policy.  In *United States v. Young*, 87 F. Supp. 3d 805 (W.D. Va. 2015), a jury convicted a prison inmate of lawful-duty bribery where he paid a prison nurse to smuggle tobacco and cell phones into his facility.  *Id.* at 806.  The Government argued that the nurse's smuggling efforts were in violation of prison policy, and the Court denied the defendant's Rule 29 motion for acquittal without any written policy in evidence, or even any testimony that the policy was written down at all.  *See id.* at 808; *see also* ECF No. 92, Trial Trans. 12:14-18 ("Q: Can you get a cell phone through legal means in prison? A: No, sir. Q: Do you know why that is? Are you aware of the policy behind that? A: I'm not for [sic] sure.").  Second, in *United States v. Trinh*, Case No. 2:15-cr-00179(A)-CA, 2017 WL 3835138, at *4 (E.D. Cal. Aug. 31, 2017), the court rejected that actually identifying a lawful duty as a factual predicate was necessary to

establish criminal liability under section 201(b)(1)(C). These two cases illustrate why this Court's approach may, in fact, be overly cautious.

In light of the foregoing, it simply cannot be said that lawful-duty bribery is utterly standardless. The term "lawful duty" is easily understood by reference to dictionary definitions and, to the extent that it is not, just as easily clarified through resort to familiar canons of statutory construction. To the extent that any vagueness concerns linger, the definition considered by the jury more than adequately assuages them. As such, Defendant's vagueness challenge fails.

### C. Actual Innocence

Next, Defendant insists that he is actually innocent of his section 201(b)(1)(C) charge because Dorsey did not violate a *lawful* duty in providing unredacted TOPA notices for cash without requiring Defendant to first file a FOIA request. Put differently, Bailey insists that when he told an associate, "[k]eep this quiet. We're not supposed to have it [TOPA notices sent by Dorsey]," Gov. Ex. 103D, he was mistaken, and he *was*, in fact, supposed to have the TOPA notices Dorsey furtively sent Bailey in exchange for money payments.

Defendant argues that the office policy in evidence, directing uninterested third parties to make a FOIA request in order to receive *redacted* TOPA notices from DHCD, somehow violates the District of Columbia's FOIA statute. In support of this argument, the only statutory provision on which Defendant relies is the "public policy" provision of the District's FOIA law, exhorting readers to "construe[] [the law] with the view toward expansion of public access[.]" D.C. Code § 2-531 (2016 Repl.). Rather, Defendant relies almost entirely on the general principle that a FOIA request may not be denied merely based on the identity of the requester.

14

Mot. at 11 (citing *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004)).[5] This salutary rule applies not to *all* public requests for documents, however, but to requests made under a FOIA statute. *See Horsehead Indus., Inc. v. U.S. EPA*, 999 F. Supp. 59, 67-68 (D.D.C. 1998) ("*FOIA* confers on members of the public a right to information" through a FOIA request (emphasis added)). To that end, the FOIA statute governs, and governs only, FOIA requests; it does not supplant all other methods by which public records can be obtained. *See id.* at 67.

More importantly, the charged conduct is not simply, for example, overpaying FOIA fees. *See, e.g.*, D.C. Code § 2-532(b-1) (adopting fee schedule for FOIA requests). Indeed, Bailey did not pay the District of Columbia government at all. Rather, Bailey, who was not a FOIA requestor, paid Dorsey to cut the line in front of *all* potential requestors of TOPA notices, whether through FOIA or some other method. Even this Court lacks the legal authority to mandate a government agency reorder requests for public information. *See In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) (court lacks authority to compel agency action unreasonably delayed without showing evidence of bad faith or no "rule of reason" applied to ordering queue); *see also Open Am. v. Watergate Special Prosecution Force*, 547 F.2d 605, 614-15 (D.C. Cir. 1976) (FOIA specifically). There is nothing in the District of Columbia's FOIA statute legalizing Dorsey sending unredacted TOPA notices to Bailey without Bailey first making a FOIA request, and FOIA's general preference in favor of public access to government documents cannot vitiate an otherwise lawful bar on Dorsey sharing *unredacted* TOPA notices with uninterested real estate developers.

---

[5] The District of Columbia's FOIA statute is interpreted the same as the federal FOIA statute. *Fraternal Order of Police, Metro. Labor Comm'n v. District of Columbia*, 113 A.3d 195, 199 (D.C. 2015).

### D. Constructive Amendment

In Defendant's strongest argument, he maintains that the Government constructively amended or varied from the Indictment at the end of its case-in-chief and during closing. In essence, Defendant argues that the Indictment alleged only DHCD's office policy was the lawful duty at issue, and the Government then proposed to the jury that it could rely on District of Columbia's ethics policies and the FOIA statute as distinct lawful duties. A close reading of the record establishes that Defendant is incorrect.

As a threshold matter, the Government may not materially diverge from the charging document at trial. The law recognizes two such diversions: variances and amendments. The Government varies from the charging document where the evidence at trial proves facts materially different from those alleged in the indictment. *See United States v. Lorenzana-Cordon*, 949 F.3d 1, 4 (D.C. Cir. 2020). A conviction may only be vacated where the variance had a "substantial and injurious effect or influence in determining the jury's verdict." *United States v. Baugham*, 449 F.3d 167, 174 (D.C. Cir. 2006). An amendment, on the other hand, occurs where "the evidence presented at trial *and* the instructions given to the jury so modified the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment." *United States v. Toms*, 396 F.3d 427, 436 (D.C. Cir. 2005) (emphasis original) (internal quotation marks omitted). To determine whether the charging document was constructively amended, a court must consider the instructions as a whole, not merely one instruction in isolation. *Id.* Constructive amendment is "fatal error." *United States v. Sayan*, 968 F.2d 55, 60 (D.C. Cir. 1992).

Therefore, the Court begins with the charging document itself, the Indictment, ECF No. 18. There, the Government described the charged lawful-duty with particularity:

> DHCD had a policy that treated Offer of Sale Notices [TOPA notices] submitted by owners to DHCD as confidential because they contained the names of tenants. As such, DHCD directed its employees not to release or disseminate TOPA Offers of Sale Notices to un-related third parties to real estate transactions. DHCD informed its employees that an un-related third party to a real estate transaction could only obtain an Offer of Sale Notice by submitting a Freedom of Information Act ("FOIA") Request to DHCD. Moreover, when DHCD produced an Offer to Sale Notice in response to a FOIA request, DHCD redacted tenant names and contact information to protect those tenants' privacy interests.

*Id.* ¶ 3. There is no mention in the Indictment of District of Columbia's ethics policies, and FOIA is referenced only in relation to the alleged office policy.

The Government made its position known throughout trial. As a legal matter, it did not believe it needed to identify the precise source of the duty and, if it did, that it factually was *only* the office policy to which two Government witnesses testified that constituted the duty at issue. As Government counsel clarified to the Court in advance of closings:

> Even under the original jury instructions, the fact that Ms. Dorsey had to follow an ethics policy for no private self-dealing and the fact that the FOIA policy required the redactions to the PII [personal identifying information] is evidence of the fact that it was known to her that she could not give out the TOPA notices. . . . [In other words, the ethics regulations and the FOIA statute is] evidence that goes to the issue of whether there was a lawful policy[, i.e., whether the office policy existed].

Trial Tr. 10/04/22 66:5-16. The Court then clarified, "I understand. It seems to me that you're making an argument that they're [the Government] relying on a violation of the statute, as that is the policy, *and they're not*. . . . That is evidence of the policy in terms of these other things that would *inform* the policy as they [the Government] has said." *Id.* 66:17-21 (emphasis added). In other words, in the Government's view, the ethics regulations and the FOIA statute were circumstantial evidence supporting its factual assertion that there was, in fact, a policy at DHCD to keep unredacted TOPA notices confidential. Given Defendant's main argument at trial was that the DHCD policy, oral in nature, did not, in fact, exist, it is only natural that the Government was focused on proving its existence.

17

The Government in closing argued exactly that.  The Government maintained to the jury that "[i]t's clear from the testimony of [DHCD supervisors], [Dorsey's] two bosses, that the names of tenants in TOPA filings are to be kept confidential."  Trial Trans. 10/6/22 at 47.  The Government then put up a PowerPoint slide featuring the ethics regulations and FOIA statute in an effort to convince the jury that these sources "also confirm that Dorsey had a lawful duty not to be giving this information out" when considered *in concert with* the supervisor's testimony regarding the existence of the DHCD policy.  *Id.* at 50.  Lest the jury be confused, and as Defendant concedes in his briefing, Defendant spent the vast majority of his closing argument addressing whether "the government had failed to prove that there was an internal DHCD policy against sharing unredacted TOPA notices."  Mot. at 17.   True, in rebuttal, the Government argued that Dorsey "[e]mailing the TOPA notices to Mr. Bailey violated the ethics policies on using her public office for private gain."  Trial Trans. 10/7/22 at 37.  But this argument was advanced in an effort to show by circumstantial evidence that the DHCD policy in fact existed insofar as it reflected the contents of this other ethics policy.  Although the Government incorrectly stated that "a lawful duty is a duty applicable to the position of the public official and made known to the public official, not the policy of an office," *id.* at 40, the Court then corrected that misstatement in its instructions to the jury.

When considering "the evidence presented at trial *and* the instructions given to the jury," and given the vast majority of the Government's and Defendant's cases-in-chief were focused on the purported DHCD policy, it is exceptionally unlikely that the jury erroneously thought the lawful duty at issue was something other than this DHCD policy.  Although the Government's closing argument certainly could have been more precise, the Court sees no error here.  The Court did not instruct the jury that the District of Columbia ethics policies or the FOIA statute

were other duties at issue, and, when compared to the rest of the evidence presented and the instructions given, they were a mere footnote over the course of the trial. Therefore, on this record, the Court does not find that the Government impermissibly varied from or constructively amended the Indictment.

### E. Sufficiency of the Evidence

Lastly, Defendant argues that there was insufficient evidence to establish that Dorsey was "made aware" of the DHCD policy, as required by the Court's instructions. Not so. Two witnesses testified that Dorsey was made aware of the policy, *e.g.*, Trial Trans. 9/28/22 at 137, Dorsey herself was worried she would be discovered for "leaking" TOPA notices to Bailey, Gov. Ex. 3B, and Dorsey was copied on at least one email memorializing the policy, Gov. Ex. 110B. This last challenge fails.

### IV.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's [254] Renewed Motion for Judgment of Acquittal or, in the Alternative, for New Trial. An appropriate order accompanies this Memorandum Opinion.

**Dated:** February 21, 2023

                                                                             /s/
                                          COLLEEN KOLLAR-KOTELLY
                                          United States District Judge