**COLLEEN KOLLAR-KOTELLY, UNITED STATES DISTRICT JUDGE**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Docket No.: 0090 1:19CR00156-001 |
| | : | |
| vs. | : | Disclosure Date: <u>July 26, 2023</u> |
| | : | |
| Bailey, Brian Winston | : | |

### PARTIES OBLIGATION AND RESPONSE TO PRESENTENCE REPORT

Pursuant to Fed. Rules of Crim. Proc. Rule 32(f)(1) and (2), the parties shall submit any material inaccuracies or disputes to the presentence investigation report (PSR), by **August 9, 2023** This form and/or objections to the PSR shall be filed via CM/ECF.

Note: The probation office never includes information about 18 USC § 3553(e) or USSG § 5K1.1, pursuant to Rule 32(c)(3).

### For the Government

(CHECK APPROPRIATE BOX)

( ) There are no material/factual inaccuracies therein.

( ) There are material/factual inaccuracies in the PSR.

### For the Defendant

(CHECK APPROPRIATE BOX)

( ) There are no material/factual inaccuracies therein.

**(X)** There are material/factual inaccuracies in the PSR.

### Restrictions on Use and Redisclosure of Presentence Report

The presentence investigation report and this form are not public documents.

It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

Objections to PSR

**Paragraph 11**: Mr. Bailey objects to the facts in this paragraph. DHCD did not have a formal policy that Offer of Sale Notices were confidential or a policy that prohibited DHCD employees from releasing or disseminating Offer of Sale Notices to unrelated third parties. There was no written policy about Offer of Sale Notices, even though DHCD formalized its policies in written form. In fact, DHCD shared unredacted Offer of Sale Notices in response to requests for them even where the requestor was not related to the transaction.

Also, any policy about redacting Offer of Sale Notices in response to a Freedom of Information Act (FOIA) request could only be issued from DHCD's FOIA office. There is no FOIA policy or regulation that requires Offer of Sale Notices to be redacted. Finally, Offer of Sale Notices are not confidential documents. No District of Columbia policy or regulation makes them confidential. Property owners were required to post them at the property itself, where anyone could see the names and contact information for the tenant. Dawne Dorsey was never trained in any FOIA policies and thus could not have been aware of any such policy.

**Paragraph 12**: Mr. Bailey disputes that Dawne Dorsey was prohibited from disseminating Offer of Sale Notices. Part of her job was to disseminate Offer of Sale Notices and she sent them to parties unrelated to real estate transactions.

**Paragraph 15-17**: Mr. Bailey objects to these paragraphs. It was not his goal to acquire as many TOPA rights as possible as it would be economically unfeasible to do so. In addition, even if Mr. Bailey obtained the TOPA rights for a specific property, it did not guarantee that he could "find investors to purchase the property and negotiate an 'assignment fee.'"

**Paragraph 18**: Mr. Bailey objects to this paragraph. The seller of a property had to post the Offer of Sale Notice in a common space at the property so a property developer could learn about the sale through this notice and not through obtaining the Offer of Sale Notice from DHCD. Every property developer had the same ability as Mr. Bailey to learn about the sale of properties because they too could see the notice posted at the property.

**Paragraph 20**: Mr. Bailey objects to this paragraph. Ms. Dorsey offered to provide the Offer of Sale Notices to Mr. Bailey, and they did not discuss any payment by him to her for the notices. Ms. Dorsey did not tell Mr. Bailey that there was any policy prohibiting her from providing them. Mr. Bailey also objects that it violated any "lawful and official duty" for Ms. Dorsey to disclose the Offer of Sale Notices to Mr. Bailey. This paragraph does not identify the source of any "lawful and official duty." If it is relying on the supposed "policy" from Paragraph 11, Mr. Bailey objects for the same reasons stated above.

**Paragraphs 21, 25, 27, 28, 31**: Mr. Bailey objects that the arrangement between Ms. Dorsey and Mr. Bailey was a "corrupt" or "illicit" agreement or services. It did not violate any of Ms. Dorsey's lawful duties to share the Offer of Sale Notices and thus the arrangement was lawful for the reasons stated in response to Paragraph 11. As for Paragraph 27, Mr. Bailey objects that this information was not available to his competitors since the property owner had to post the same information at the property itself and Mr. Bailey's competitors thus had access to it as well.

**Paragraph 28**: Mr. Bailey objects to this paragraph. He did not provide Ms. Dorsey with a share of any profits in return for a copy of these notices.

**Paragraph 29**: Mr. Bailey objects to this paragraph. Ms. Dorsey sent many emails from her DHCD account about sharing these notices with Mr. Bailey and thus did not conceal it from DHCD. This paragraph also misstates what Mr. Bailey said during his interview with the Office of the Inspector General. According to the interview memo, Mr.

Bailey denied receiving the "TOPA list" by email, not that he denied receiving any "TOPA information" by email. There was a list of TOPA sales by property address that DCHD sent by email, and this was what Mr. Bailey was referring to. Also, because the TOPA sales list was posted on the DHCD website, Mr. Bailey was truthful when he said he could access information on the website.

**Paragraphs 32-33**: Mr. Bailey objects to these paragraphs. Mr. Bailey asked Mr. Paitsel to obtain contact information for tenants in certain properties, which is available through searches of public databases. Mr. Bailey did not know that Mr. Paitsel was accessing CLEAR or that there were limitations to Mr. Paitsel's access. Rather, Mr. Bailey—who was extremely experienced in "skip tracing" himself—asked Mr. Paitsel to obtain information that is publicly available. The fact that the CLEAR database has "sources of information generally unavailable to commercial customers" is irrelevant since Mr. Bailey did not ask Mr. Paitsel to obtain anything other than publicly available contact information. He did not, for example, ask for criminal histories or vehicle registrations. In addition, Mr. Bailey made two payments to Mr. Paitsel (one in cash for $2500) and one check (for $6500). Neither of these payments was for contact information for tenants. The $2500 payment was to thank Mr. Paitsel for having provided financial support to Mr. Bailey's family in the past, when Mr. Bailey was going through financial trouble. The $6500 payment was to assist Mr. Paitsel in remodeling his basement.

**Paragraphs 34-36, 38, 39, 40**: Mr. Bailey objects to these paragraphs as there is no evidence that he knew that Mr. Paitsel was prohibited from obtaining the contact information for these tenants or that Mr. Paitsel was obtaining the information through the CLEAR database. As a result, Mr. Bailey did not knowingly enter into a "corrupt" or illegal agreement with Mr. Paitsel. In addition, Mr. Bailey did not give Mr. Paitsel any money in return for obtaining contact information for tenants. As explained in the response to

Paragraphs 32 and 33, Mr. Bailey made two payments to Mr. Paitsel but they each had a different purpose.

**Paragraph 39**: Mr. Bailey objects to this paragraph. As explained in Mr. Bailey's response to Paragraph 38, the two payments to Mr. Paitsel ($2500 and $6500) were for matters other than this information. There is no evidence to link these payments to the property purchase price.

**Paragraph 40**: Mr. Bailey objects to this paragraph as it was not an illicit or illegal scheme. TOPA information is public information and posted at the properties that were for sale.

**Paragraphs 42-46**: Mr. Bailey objects to these paragraphs. Mr. Bailey did not receive $341,465 from his payments to Ms. Dorsey and Mr. Paitsel. This amount results from the sale of three properties: 224 T Street NE ($40,000); 3021 15th Street NW ($251,465) and 1407 10th Street NW ($50,000). Mr. Bailey already knew about these properties before Ms. Dorsey sent the Offer of Sale Notices to him through (1) his access to the multiple listing service (MLS); (2) discussions with real estate brokers directly; or (3) access to email listservs by commercial real estate brokers who would send out information about soon-to-be-available properties. Because Mr. Bailey was already interested in those properties, the information provided by Ms. Dorsey was not new to him and did not alert him to a property that he would not have already pursued.

**Paragraph 51**: Mr. Bailey objects to this paragraph. As noted above, sharing the Offer of Sale Notices did not violate any lawful duty of Ms. Dorsey.

**Paragraph 52**: Mr. Bailey objects to this paragraph. He denies that his payments to Ms. Dorsey or to Mr. Paitsel were illegal bribes for the reasons explained above. Mr. Bailey did not recruit Ms. Dorsey into any "scheme." Rather, she offered to send him the Offer of Sale Notices after he explained how difficult it was for him to get downtown to obtain them

in person. Mr. Bailey also did not recruit Mr. Paitsel into any "scheme." Mr. Bailey and Mr. Paitsel had been business partners for several years at the time of the two payments at issue in this case.

**Paragraph 64**: Mr. Bailey objects to this paragraph. Even if the two payments to Mr. Paitsel are considered to be bribes, they are not "separate" for the purposes of USSG § 2C1.1(b)(1). They were part of the same supposed "scheme" and around the same time (1/12/2018 for the $6500 check and around 10/7/2017 for the $2500 cash payment). In addition, the payments to Ms. Dorsey were not "separate" bribes either. Rather, the government's theory was that it was one "scheme" through which Mr. Bailey agreed to pay Ms. Dorsey $500 per month. Thus, they are effectively installment payments, which are counted as one bribe. USSG § 2C1.1(b)(1) Application Note 2.

**Paragraph 65**: Mr. Bailey objects to the application of this Specific Offense Characteristic. As explained in response to Paragraphs 42-46, even if these payments are considered to be illegal bribes, the information provided by Ms. Dorsey and Mr. Paitsel did not cause any loss. Mr. Bailey already knew about the sale of these properties and thus would have taken advantage of them whether or not he had the information provided by Mr. Paitsel or Ms. Dorsey. As the PSR notes in Paragraph 159, the loss amount "may over-represent the seriousness of the offense." In addition, Paragraph 55 notes that there "is no identifiable victim who suffered a monetary loss as a result of the criminal conduct."

**Paragraph 66**: Mr. Bailey objects to the application of this Specific Offense Characteristic. Neither Ms. Dorsey nor Mr. Paitsel had "a high-level decision making or sensitive position." Application Note 4 defines this as "a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process." Ms. Dorsey was an administrative assistant-level person in DHCD. Mr. Paitsel was an FBI

agent who had no supervisory or decision-making role in the government. *U.S. v. Henderson*, 465 F.Supp.3d 778, 779.

**Paragraph 68**: Mr. Bailey objects to this Specific Offense Characteristic. For the reasons explained in the response to Paragraph 52, Mr. Bailey did not recruit either Mr. Paitsel or Ms. Dorsey into any illegal "scheme."