UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | No. 19-CR-156 (CKK) |
| : | |
| BRIAN BAILEY, : | |
| : | |
| Defendant. : | |

## UNITED STATES' SENTENCING MEMORANDUM

Defendant Brian Bailey wanted to buy rental properties from landlords and flip them for a profit. But under District law, before landlords can sell to a developer like Bailey, they must give their tenants the first opportunity to buy—a "right-of-first refusal," which tenants can assign to someone else. Bailey sought out tenants living in buildings for sale and tried to buy up their rights so that he could use them to get the first and best chance to purchase the buildings from the landlords. To gain an advantage, Bailey resorted to bribery. He paid off a city housing official, Dawne Dorsey, to give him information about sale offers on rental properties before the information was available to the public (and thus his competitors); and he paid off an FBI agent, Codefendant David Paitsel, to use law enforcement tools to help him track down the tenants. For this repugnant conduct, motivated by greed, for which a jury sitting in the District of Columbia convicted Defendant Bailey of two counts of bribery and two counts of conspiracy, the Government requests that the Court impose a United States Sentencing Guidelines (U.S.S.G. or "Sentencing Guidelines") compliant sentence of 121 months' incarceration and the maximum fine allowable.

I. **Procedural Background**

On May 14, 2018, a grand jury sitting in the District of Columbia returned a five-count Indictment charging Defendant Bailey with conspiracy to commit bribery and bribery in connection with bribes he paid to Dawne Dorsey (Counts One and Two), and conspiracy to commit bribery and bribery in connection with bribes in paid to Codefendant Paitsel (Counts Three and Four). Count Five charged Defendant Paitsel with bribery for his receipt of Bailey's bribe payments. On October 7, 2022, a jury convicted both defendants of all counts.

II. **Factual Background**

a. TOPA and Bailey's Business Scheme

The District of Columbia's Tenant Opportunity to Purchase Act (TOPA) gives tenants an assignable right-of-first refusal to purchase their home if the landlord decides to sell it. Trial Tr. 9/28/22 at 65-66 (Ladd Testimony). Before they can close on a sale, landlords must give their tenants written notice of a sale offer, afford the tenants a chance to match the offer, and file paperwork certifying as much with the Department of Housing and Community Development ("DHCD"), the government agency responsible for enforcing TOPA. Trial Tr. 9/28/22 at 67-68 (Ladd Testimony). Once served with a sale offer, tenants have 15 days to exercise their "right-of-first-refusal"—to try and purchase the property. This "right-of-first refusal" is commonly referred to as a tenant's "TOPA rights." Tenants can assign their TOPA rights to someone else, including other tenants or a third-party, such as a property developer. *Id*. at 67. A property developer—or any other person—that acquires TOPA rights can competitively position itself to purchase a property, because no other buyer can finalize a deal without the TOPA-rights-holder getting the chance to beat it. *Id*. That is precisely what Defendant Brian Bailey wanted to do.

2

According to the evidence presented at trial, Bailey wanted to identify tenants with TOPA rights and acquire as many of those rights as necessary to emerge as the only person positioned to match a sale offer within the 15-day window.  If Bailey succeeded in being the only person to match the sale offer—to be the only person exercising a right-of-first refusal when all the other TOPA rights expired—he could then find investors to purchase the property and negotiate an "assignment fee"—basically a "finder's fee"—for himself.  In Bailey's own words:

> Washington DC is unique to any other jurisdiction in the country in that every tenant that's renting a residence has "The 1st right of refusal" to purchase the property they live in. . . .  Once I purchase the tenant rights, I affectively become the tenant and buyer simultaneously! I get the opportunity to purchase the house, match or re-negotiate the contract and then sell my rights to purchase the property to another investor without actually taking title to the property.
>
> One objective is to accept the contract and terms as they are or try to get the price on the contract slightly lower.  The main objective to is to get the tenant to relocate!!!!  Once the tenant relocates or and the property becomes vacant most investors will be willing to purchase the property for a premium (above the price on the contract itself).  The difference between the contract price and the premium amount that an investor is willing to pay is the margin of profit that's left over.

Government Trial Exhibit 103C (Jan. 24, 2017, email to an associate).

Property developers seeking to acquire TOPA rights, like Bailey, would want nothing more than to get their hands on the sale offers filed with DHCD, and to do so as soon as possible within the 15-day expiration window.  But that is not how TOPA and DHCD work.  DHCD makes filed sale offers available to the public, but without identifying the tenants on whom the sale offers have been served.  To prevent property developers from taking advantage of tenants, DHCD has a policy of keeping the identities of tenants with TOPA rights confidential from third parties, except in response to a request under the District's Freedom of Information Act (FOIA)—a process that usually takes up to 15 business days. Trial Tr. 9/28/22 at 68 (Ladd Testimony); Trial Tr. 9/28/22 at 128 (Pair Testimony).  Thus, for the most part, developers interested in acquiring TOPA rights

3

must use their own means to identify tenants after learning that a property has been offered for sale. A property developer capable of identifying tenants with TOPA rights at the same time sale offers are filed with DHCD would have a competitive advantage in the race to make money off the property sale. Trial. Tr. 9/28/22 at 111 (Ladd Testimony).

For Bailey, that is where Dawne Dorsey came in.

### b. Bailey's Bribery of Dorsey

During the period relevant to this trial, Dawne Dorsey was a Program Specialist at DHCD. She worked for Lauren Pair, who in turn worked for Allison Ladd. Trial Tr. 9/28/22 at 66 (Ladd Testimony). Her responsibilities involved handling TOPA information, including the above-described sale notices that trigger TOPA rights. 9/28/22 Trial Tr. at 135 (Pair Testimony). Dorsey had access to the tenant information Bailey wanted. But Dorsey was specifically instructed not to give out the names of people who had TOPA rights as identified on the TOPA paperwork filed with DHCD. *See* Trial Tr. 9/28/22 at 136-137 (Pair Testimony). She was also required to keep the TOPA paperwork confidential. *Id.*

Bailey met Dorsey in February 2016 and offered her approximately $500 per month to provide him with copies of landlord-filed sale offers from which he could identify tenants with TOPA rights. Dorsey accepted. On and off over the next two years, Dorsey took Bailey's money and, in return, disclosed sale offers containing tenant information, in violation of her lawful and official duty to DHCD. The pair's corrupt bargain is the basis for Count One charging him with conspiring with Dorsey to commit bribery; and Count Two, charging Bailey with bribery of Dorsey.

Bailey and Dorsey's corrupt agreement is well-documented in email and text exchanges. For example, on June 13, 2016, Bailey reiterated the terms of their agreement in an email to Dorsey complaining that Dorsey was not providing him TOPA information fast enough:

> I want to sit and speak with you regarding our arrangement. You sending files isn't working out the way I thought it would. Initially I was getting files almost daily. Now I'm receiving files maybe 2 or 3 times a month.
>
> The files are time sensitive and most of the time I get them so late that I might only have a week or less to react. While I did finally flip 1910 5th Street on Friday, it really wasn't any money in it…by the time I pay Sidney who actually got the tenant rights, pay the tenants and pay you…I might make 3500 net.
>
> I'm paying you every month consistently with the exception of June because I've been in NJ…but you know that. This month alone I haven't received any emails form you at all…so if that's how it's going to play out…I'd rather not do it. It doesn't do me any good to receive the files with almost no time to react. We missed 2 real good opportunities to make some money but we didn't because u sent the files with days left on the acceptance period…. I can meet with you this evening at my house to give you your cash but I really need to know what your plans are because I've been straight up with you and I feel like you're bullshitting.

Government Trial Exhibits 102B, 102C. Dorsey responded that she understood Bailey's expectations and explained that she had difficulty balancing her official duties to the District of Columbia with her illicit duties to Bailey—and assured him that she would do a better job at her illicit duties:

> I understand what you're saying and I'm not bullshitting at all. I've been trying to send them as we got them but we were having issues processing Mail on time, especially with missing one of our employees. It left me with handling walkin clients then by the time I could scan it would be late. But we just got another employee so I could send them as soon as they come in…

Government's Trial Exhibit 102B. The night that Dorsey sent this email, the two met at Bailey's house, firmed up their corrupt arrangement, and Bailey paid Dorsey cash. *See* Government's Trial Exhibit 2A, 3B (lns. 2623-2630). The next day, Dorsey put her DHCD position to work for Bailey,

disclosing to him unredacted TOPA information not available to the general public, including Bailey's competitors. *See* Government's Trial Exhibit 3B (lns. 2609-2622).

The evidence a trial showed that Defendant Bailey paid at least $7,000 in bribes to Dawne Dorsey (by check), and an untold amount to Dawne Dorsey in cash. *See, e.g.*, Government's Trial 1M (checks), Exhibit 101E (Bailey emails an associate on February 29, 2016, to inform him that, "I'm gonna go down to DHCD to slide our friend an envelope" and asks "do u want to split it"); Government's Trial Exhibit 3B (ln. 2349) (Bailey texts Dorsey on August 8, 2016, that "[y]ou can go by [Bailey's house] and pick your money up . . ."); *id.* (Bailey texts Dorsey on November 3, 2016, that "I will see u on Sunday with some money."). Bailey also tried to incentivize Dorsey by offering her a share of his profits: "If it's a unit and I get the rights and they close on it…I could give you 10,000 on something like that…..I've got an investor that pressing me on this one. Even if it's not a multi-unit and I get the rights and they close…I'll give you 5,000… This is the best one so far." Government's Trial Exhibit 102A.

Bailey and Dorsey's corrupt intent is evident from their concealment. Dorsey did not reveal to DHCD that she accepted money from or gave tenant information to Bailey—the latter of which she typically accomplished through her personal email account, rather than her DHCD email account. For his part, although this information was not before the jury, Bailey lied about the arrangement to the District of Columbia Office of Inspector General (DC-OIG) during a sworn interview in 2017, during which he: (1) falsely denied paying any District employee for TOPA information; (2) falsely denied knowledge of any DHCD employee selling TOPA information; (3) falsely denied receiving TOPA information by email; and (4) falsely claimed that he obtained TOPA information from the DHCD website. He also falsely testified at trial that the payments he

6

made to Dorsey were to pay her for styling his daughter's hair even in the face of documentary evidence that Dorsey would not charge him for such services.

Dorsey's illicit services were invaluable to Bailey. In July 2016, he confided in an associate that without the "person [ ] responsible for the files that are being sent," "I have nothing!" Government's Trial Exhibit 103A; *see also* Government's Trial Exhibit 103D (Bailey emails an associate TOPA information on February 8, 2018, warning him to "[k]eep this quiet. We're not supposed to have it."). Approximately two years later, in May 2018, shortly before his scheme was exposed, Bailey bragged to another associate that he had cornered the market in TOPA transactions: "If it's a TOPA transaction anywhere in DC and I'm on it, there is a 99.9% chance that no one will be able to get it. #NoConcernsAtAll#They'rewastingtime#." Government's Trial Exhibit 108B.

Even with the competitive advantage afforded by putting Dorsey on his illicit payroll, the information Bailey paid for was not always sufficient to track down tenants and buy their TOPA rights. On occasion, Bailey needed more help. That is where Defendant David Paitsel came in.

c. **Bailey's Bribery of Paitsel**

The files Dorsey provided did not necessarily contain information helpful to contacting tenants and bargaining for their TOPA rights. As Bailey told Paitsel: "The TOPA stuff is doing ok…obviously a lot depends on tracking people down. Even when I get to them there's no guarantee but it only takes 1 or 2 to make it worth while." Government's Trial Exhibit 104A (Apr. 22, 2017, email). To help him track tenants down, Bailey turned to Paitsel, an FBI special agent with access to law enforcement tools designed to track people down. One of those tools was an investigative database called CLEAR.

7

CLEAR is an online investigation software product that allows law enforcement agencies to conduct searches for, among other things, people's addresses, telephone numbers, email addresses, and other personal identifying information. The software packages together law enforcement and other government and commercial databases from jurisdictions across the country so that they can be accessed through a single search engine, giving law enforcement personnel access to real-time and historical data about individuals, including criminal histories, vehicle registrations, cell phone information, and other personal data.

The jury heard testimony about the sensitivities associated with the use of CLEAR, a commercial database provided by Thompson-Reuters. Trial Tr. 9/29/22 at 131-137 (Quinn Testimony) (discussing the nature of data stored in CLEAR). The FBI has its own contract with Thompson-Reuters for the use of CLEAR. *Id*. at 132. The database compiles vast amounts of personal information from public records and other commercial sources not readily available to the public: names, phone numbers, email addresses, home addresses, social security numbers, dates of birth, employment records, vehicle records, known associates and relatives, just to name a few. *Id*. at 131-136. The database is so sensitive that FBI agents must state a permissible purpose before they are even able to run a search in the database. *Id.* at 137 (Q: Okay. I think you used the word "permissible" or "permissible reasons" a few minutes ago, and I think that you -- well, why are some of the reasons why there are permissible reasons for the use of CLEAR? A: Why are some of the reasons? Q: Or what. A: The sensitive nature of the data.). A federal statute called the Gramm-Leach-Bliley Act provides that misrepresenting the access purpose is a violation of the CLEAR subscriber agreement and other federal and state laws. *Id.* at 136-1367. And, if an FBI agent wants their CLEAR search to include motor vehicle records, another federal statute—the

8

Driver's Privacy Protection Act of 1994—requires that the agent again state their purpose prior to running a search. *Id*. at 138.

The evidence showed that David Paitsel looked up contact and other sensitive information of tenants holding TOPA rights in CLEAR and shared that information with Bailey. *See., e.g.,* Trial Tr. 9/30/22 at 39-40 (Waltz Testimony)(Q: What did David Paitsel do after Mr. Bailey sent him this TOPA notice? A: He performed queries in CLEAR."). Paitsel accessed the CLEAR database to do so at least thirty times. Government Trial Exhibit 104C. On each occasion when Paitsel accessed CLEAR, Paitsel lied about his purpose for using the database. Government Trial Exhibit 104C.

At trial, Defendant Paitsel's FBI supervisor, Temitaya Aderoba testified that CLEAR was a law enforcement application used by FBI employees to locate people. Trial Tr. 9/29/22 at 93-94 (Aderoba Testimony). He explained that it was only to be used for official purposes, and that FBI agents were not permitted to use it for their own personal use, even on their own time. *Id.* at 94-95. He further testified that Defendant Paitsel, during the time under his supervision, had no official reason to use CLEAR. *Id*. at 97.[1] He also discussed ways in which the aggregation of data can make it confidential. *Id*. at 112.

The government also presented the jury with email messages in which Bailey promised he would pay Paitsel for the information Paitsel had given to Bailey. Government Trial Exhibit 106E (6/17/17 Email from Bailey to Paitsel: "Hey Bro… I owe you 5K!!! I found [NAME

---

[1] Mr. Aderoba further explained that according to the FBI ethics guidance, "[a]n FBI employee may not access any official FBI recordkeeping system to perform a criminal background or indices check to determine whether there is any derogatory information on a person who is dating her son. Such access constitutes a misuse of the nonpublic information contained in the database," and that this example was meant to guide FBI Employee conduct. Trial Tr. 9/29/22 at 120 (Aderoba Testimony).

9

REDACTED]. He assigned his rights over to me."); Exhibit 106G (12/1/17 Email from Bailey to Paitsel: "Looks like we will get our money for 3021 15th Street NW ... I owe you 5k on that. 1407 10th Street hopefully will close by the beginning of the year. That one will give you 1500-2500."); Exhibit 105G (10/4/17 Email from Bailey to Paitsel: "I will have the money tomorrow from the smaller deal. Do you want to meet this weekend so I can get it to you?"). In sum, evidence showed that Defendant Bailey paid Defendant Paitsel over $10,000 in bribe payments (at least $4,100 in cash, and $6,500 by check). *See* Government's Trial Exhibits 1N and 1O.

Defendant Bailey's schemes were overwhelmingly successfully. For example, he parlayed the information into a $40,000 profit on the deal relating to 224 T Street NE. *See* Government's Trial Exhibits 105D and 105E. And, he made another $250,000 on the deal relating to 3021 15th Street NW. *See* Government's Trial Exhibits 106D, 106E, and 106H.

### III. The Applicable Sentencing Guidelines

To determine an appropriate sentence, the Court must first accurately calculate the Defendant's advisory Sentencing Guidelines range. *Gall v. United States*, 552 U.S. 38, 49-50 (2007).

The Government and United States Probation Officer agree on the following Sentencing Guidelines Calculation:

Base Offense Level (Bribery) (U.S.S.G §2C1.1(a)(2)):                     12

Specific Offense Characteristics
More than one bribe (U.S.S.G. §2C1.1(b)(1)):                              +2
Offense involved a public official in a sensitive position,
(FBI Special Agent David Paitsel) (U.S.S.G. §2C1.1(b)(3)):               +4
Benefit received > $250,000,
(U.S.S.G. §§2C1.1(b)(2), 2B1.1(b)(1)(G)):                                +12

Adjustments
Leader/organizer adjustment (U.S.S.G. §3B1.1(c))                         +2

Adjusted Offense Level                                                                                              =32

At Offense Level 32, the Defendant faces a Sentencing Guidelines compliant sentence of 121 to 151 months' imprisonment, and a fine of $35,000 to $350,000. The fine is capped at $250,000 or twice the pecuniary gain to Defendant Bailey derived from the offense. *See* 18 U.S.C. § 3571(b), (d). Here, twice the pecuniary gain would be at least $500,000.

### IV.     The Appropriate Sentence Considering the Factor Set Forth in Section 3553(a)

To determine an appropriate sentence, after the Court accurately calculates the Defendant's advisory Guidelines range, it should consider the various factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. 38 at 49-50 (2007). These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to promote respect for the law, just punishment, and adequate deterrence. 18 U.S.C. § 3553(a). The United States submits that considering these factors, a guidelines sentence Offense Level 32 (Zone D, 121 to 151 month's incarceration) is appropriate and not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). The United States also submits that the maximum fine of is warranted.

First, the nature and circumstances of the offense support a significant sentence. The Defendant took great pains to abuse the public trust to line his own pockets, time and time again. Abusing the public trust is particularly egregious when, as here, the motivation was pure greed. This is not a victimless offense. The residents of the District of Columbia have a right to the honest services of its public officials, and Defendant Bailey deprived the people of the District of that right.

The second factor that the Court must consider in fashioning an appropriate sentence is the history and characteristics of the defendant. The portrait of the Defendant set forth in the

11

Presentence Report is not one that excuses his behavior, nor provides a reason to depart from the Guidelines recommendations. He is far from destitute, does not a have a substance abuse problem, nor a history of mental illness. He is a sophisticated businessperson and knew exactly the risk he faced when he bribed Ms. Dorsey and Defendant Paitsel, and now must live with the consequences.

The Defendant's sentence must also reflect the seriousness of the offense to promote the rule of law, to provide just punishment, and to provide adequate deterrence. These factors too support a significant sentence. Unlike his co-conspirator, Dawne Dorsey, Bailey has taken no responsibility for his actions and has expressed no remorse.[2] He has demonstrated a complete disregard for the rule of law, and testified to a ridiculous story on the witness stand by telling the jury that he paid Ms. Dorsey to do his daughter's hair—despite clear evidence to the contrary. He is a man of significant means, suggesting that only a lengthy term of incarceration and the maximum possible fine will have a deterrent effect, lest he simply pay to play, and continue his corrupt behavior.

V.    **Forfeiture and Restitution**

"[T]he [Mandatory Victims Restitution Act or "MVRA"] requires the sentencing court to order restitution to the victims of defendants who are convicted of certain enumerated crimes," which include crimes involving fraud and deceit. *United States v. Smith*, 297 F. Supp. 2d 69, 71 (D.D.C. 2003); *see also* 18 U.S.C. § 3663A(a)(1) (stating that "court shall order" restitution). Bribery, the substantive crime of conviction, certainly involved deceit. When Defendant Bailey paid certain tenants a pittance for their TOPA rights without explanation he was defrauding them of their property. Here, the victims also include the tenants for whom confidential information

---

[2] On June 7, 2019, Dorsey pleaded guilty to bribery under a cooperation agreement. *See United States v. Dawne Dorsey*, 1:19-cr-164-CKK, ECF No. 5 (D.D.C. June 7, 2019).

was disclosed. At a minimum, the Defendant should be ordered to pay $40,000 to Patrick Brown for the 224 T Street deal.

## VI. Conclusion

For years, Brian Bailey and David Paitsel made a quick buck at the expense of the public trust. Bailey kept Dorsey and Paitsel on his secret illicit payroll and, in exchange, the two public officials eagerly sold Bailey information to which their official positions afforded them unique access. For this abhorrent conduct, Defendant Bailey should serve a sentence consistent with the applicable Sentencing Guidelines and pay the maximum fine allowable.

Respectfully submitted,

Respectfully submitted,
MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Elizabeth Aloi*
Elizabeth Aloi
John W. Borchert
D.C. Bar. 1015864 (Aloi)
D.C. Bar. 472821 (Borchert)
Assistant United States Attorneys
601 D Street, N.W.,
Washington, D.C. 20530
(202) 695-0610 (Aloi)
(202) 252-7679
Elizabeth.Aloi@usdoj.gov
John.Borchert@usdoj.gov