## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) Case No. 1:19-cr-00156-CKK |
| BRIAN BAILEY, et al, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

## DEFENDANT BRIAN BAILEY'S SENTENCING MEMORANDUM

Brian Bailey grew up in Logan Circle in the 1980s, long before it transformed into expensive townhomes and trendy gathering spots. He is a lifetime resident of the District of Columbia area. Watching his parents struggle financially, Brian promised himself that his own family would never worry the same way. And thanks to a combination of a loving family and a relentless work ethic, Brian turned a job running errands for a real estate agent into managing a valuable portfolio of commercial real estate properties.

Brian's financial success is impressive but, as one person puts it, his "dedication to providing safe, clean, and affordable housing to thousands of tenants in Washington, D.C., is truly commendable. His work in the field of affordable housing has had a profoundly positive impact on [the District] community, ensuring that individuals and families have access to quality housing options. His commitment to maintaining high standards of living for his tenants, while also keeping the housing affordable, demonstrates his unwavering dedication to our community's well-being." Letter from Max Snider.

Brian "has renovated over 100 housing units across several Washington, DC neighborhoods, most of which are now leased to affordable housing programs that serve a critical need in our community. Unlike many real estate investors who cut corners and install lower grade finishes for affordable housing units, Brian does quite the opposite - he goes above and beyond to create modern, luxurious apartment homes that dignify their residents." Letter signed by John Burns, Len Adler, and Dan Adler of the Adler Financial Group. https://www.adlerprivatelending.com/

Along the way, Brian has also been an inspiration to "the young boys we coached and mentored [who] lived in challenging neighborhoods in SE Washington, D.C., where role models and opportunities to thrive within their boundaries are exceedingly rare due to economics and personal circumstances." Letter from Avery Harwell.

A few years ago, the government indicted Brian for bribery. This Court, sitting just a few blocks from the United States Capitol and the District's Wilson Building, has no doubt handled more public corruption cases than any other. It has observed lobbyists pay bribes for their clients to win influence over legislation; it has witnessed government contractors pay agency officials to award them millions of dollars in federal work; and it has seen companies pay inspectors to shortcut regulatory red tape. But this Court has never seen a guilty verdict where the crime involved paying a government employee to obtain *public* documents and *public* information in supposed violation of a local agency's *unwritten* and *unpublished* administrative rule. That's because the Department of Justice has never before used this theory to charge someone in this Court or anywhere else in the country.

The novelty of the government's legal theory, however, is a matter for appeal and not for sentencing. This memorandum will focus on the sentencing factors under Section 3553, including the fact that Brian's conduct had no victims and no loss to the District government. Brian hopes that once the Court considers the lack of any need for additional specific or general deterrence—and in light of Brian's decades- long record of supporting our local community—it will sentence him to no more than a year and a day, with half of the time served in home detention.

## I.    Mr. Bailey's Background

Brian Winston Bailey was born in Washington, D.C. and is the youngest of seven children. His parents, both deceased, provided him with a loving and stable home during his childhood. His father retired as a microbiologist and his mother retired from the U.S. Treasury Department.

Brian graduated from Woodrow Wilson (now Jackson-Reed) High School in 1988. He attended Prince George's Community College from 1989 to 1991, and was enrolled in business courses. He continued his education at University of Maryland University College from 1992 to 1994, but did not graduate. He recently re-enrolled at University of Maryland Global Campus (UMGC) in January 2023 and is expected to receive a Bachelor's of Business Management in December 2023.

He has been together for 26 years and lives in Prince George's County, Maryland with his wife and children. His son works in the family real estate business.

## II.    The Guidelines Calculation Is Not Correct

The PSR calculates the total offense level to be 32 and Mr. Bailey's criminal history to be zero, resulting in a range of 121 to 151 months. Probation recommended a

sentence of 48 months because the loss amount overstates the seriousness of the offense conduct.

The Guidelines calculation is incorrect in two ways. First, the loss amount for purposes of §2C1.1 is $17,600, not $290,000. Second, under the new amendments to the Guidelines, Mr. Bailey's total offense level should be reduced by two levels because his criminal history is zero. The total offense level should be 22 rather than 32, reducing the range to 41-51 months.

### A. The Loss Amount Is Far Lower Than the Government Contends

The primary driver of the Guidelines calculation is the amount of loss attributed to Mr. Bailey's conduct—adding twelve levels. The government contends that the loss is $290,000. Dkt. 281 (Gov's Sentencing Memo.), at 10. Although Probation agreed with this loss calculation, it concluded that "the loss table at USSG §2B1.1(b)(1) may over-represent the seriousness of the offense" and recommends a downward variance from the Guidelines range to 48 months. PSR ¶ 59.

The government's sentencing memorandum justifies this loss amount in a single brief paragraph, arguing that Mr. Bailey "parlayed the information [from Ms. Dorsey and Mr. Paitsel] into a $40,000 profit on the deal relating to 224 T Street NE" and "he made another $250,000 on the deal relating to 3021 15th Street NW." Gov's Sentencing Memo. at 10. Notably, the government does not explain how the offense conduct caused these losses for the purposes of the Court's sentencing decision.

In fact, under the plain language of the Guidelines—and the facts of this case— the loss is nowhere close to $290,000. Section 2C1.1(b)(2) provides that the Court may

increase the sentencing level using the table in §2B1.1 using the "greatest" of one of four amounts:

  (1) The "value of the payment";
  (2) The "benefit received or to be received in return for the payment";
  (3) The "value of anything obtained or to be obtained by a public official or others acting with a public official"; or
  (4) The "loss to the government from the offense."

The government does not explain in its sentencing memorandum which part of §2C1.1(b)(2) justifies its loss amount—whether it is a "benefit received" or "value of anything obtained" or "a loss to the government." Its failure to identify its reasoning under the Guidelines is a red flag: the government cannot justify its proposed loss calculation under the Guidelines or the precedent interpreting it.

As the evidence at trial revealed, Mr. Bailey learned about these two properties *before* Ms. Dorsey sent him the TOPA notices and therefore the information she provided did not unilaterally lead to his profits. As for 224 T Street, the seller filed the TOPA notice on May 4, 2017, stating that the building was "unoccupied due to fire." Ex. 105D (page 185). Ms. Dorsey sent the TOPA notice to Mr. Bailey a week later. *Id*. But Mr. Bailey testified that he knew about the sale of the property before the fire and thus before Ms. Dorsey sent him the TOPA notice. 10/3/22 Tr. at 119-120.

As for 3021 15th Street, Mr. Bailey, as a licensed real estate agent, had access to the Multiple Listing Service or MLS. 10/3/22 Tr. at 86-87. The MLS provides information about properties for sale before the information is available to the public. *Id*. The MLS system shows that the property was listed on May 16, 2016. Mr. Bailey learned about 3021 15th Street through the MLS listing, and before Ms. Dorsey sent him the TOPA notice. 10/3/22 Tr. at 121. In fact, Mr. Bailey visited 3021 15th Street

"prior to obtaining an offer of sale" from Ms. Dorsey. *Id*. at 105. Ms. Dorsey did not send Mr. Bailey the TOPA notice until May 11, 2017—a year after it had been listed. (Ex. 105A).

Mr. Bailey legally purchased the TOPA rights from the tenants at these two properties. He identified and negotiated separately with another real estate developer to resell the TOPA rights at a profit. The government's loss amount is from the very end of this long chain of events, all of which are distant from, and unconnected to, what Ms. Dorsey and Mr. Paitsel did. Indeed, neither Ms. Dorsey nor Mr. Paitsel could directly facilitate or could prevent Mr. Bailey's purchase of the TOPA rights from the tenants or the resale of these TOPA rights to another developer. Mr. Bailey had to convince the tenants to sell him their TOPA rights. He explained that he has paid as much as $25,000 to an individual tenant and $600,000 to a group of tenants to purchase their rights. 10/3/22 Tr. at 84. These are arm's-length negotiations, and the tenant can say yes or no—no matter what information Mr. Bailey has about the sale.

Turning to §2C1.1(b)(2), there was no "loss to the government from the offense." Ms. Dorsey emailed Mr. Bailey copies of public documents and Mr. Paitsel gave Mr. Bailey addresses and phone numbers from the CLEAR database. Neither of these caused any monetary loss to the government.

Likewise, there was no evidence at trial proving that the TOPA notices or the information in the CLEAR database had a fair market value that would equal $290,000. Indeed, immunized government witness Alvin Rice testified that he knew how to "skip trace" a person, which meant using paid commercial databases to

"develop[] information on a person that you're seeking to get." 9/29/22 Tr. at 68. This information included the person's telephone number and address and could even include the person's social security number or credit report. *Id.* at 68, 73; *see also id.* at 74 ("when asked what information Mr. Dunn could obtain through whitepages.com, explaining, "[j]ust pretty much their current address, past address, current telephone numbers, past telephone numbers, and relatives."). The $290,000 in profits from these two real estate deals do not reflect the "value of anything obtained or to be obtained by a public official or others acting with a public official" under §2C1.1(b)(2).

The only theory on which the government could possibly be relying is that the $290,000 is the "benefit received or to be received in return for the payment." The government bears the burden to prove a causal link between Mr. Bailey's payments to Ms. Dorsey and the supposed "benefit" he received "in return for the payment" to her. *United States v. Ring*, 811 F. Supp. 2d 359 (D.D.C. 2011). While the causation standard may be low, it is not nonexistent. There are three fatal problems for the government's position on loss.

**First**, the "benefit" under the Guidelines must be a *government* benefit and here the "benefit" was from a private real estate developer's payment to Mr. Bailey in return for the TOPA rights he bought from the tenant. *See* §2C1.1 App. Note 3 (explaining that "value of 'the benefit received or to be received' means the net value of such benefit. <u>Examples</u>: (A) A government employee, in return for a $500 bribe, reduces the price of a piece of surplus property offered for sale by the government from $10,000 to $2,000; the value of the benefit received is $8,000. (B) A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the

value of the benefit received is $20,000."). This loss calculation is most often used when someone bribes a procurement official to win a federal contract and the court uses the profit on the contract as the "benefit received" for the payment. But the government does not claim that Mr. Bailey paid Ms. Dorsey in return for a government benefit worth $290,000.

**Second**, the Guidelines' plain language requires a direct causal link: the "benefit" must be "received ***in return for*** the payment." The "payments" were to Ms. Dorsey and Mr. Paitsel, but the "benefits" were from third-party non-governmental real estate developers. The government effectively reads out the "in return for" language.

This Court has cautioned against finding loss where there is an "attenuated, if not nonexistent, causal link between" the benefit and the corrupt payments. *Ring*, 811 F. Supp. 2d at 377. The government's loss argument here contains no articulable limit to the causal chain under §2C1.1(b)(2). Here, Mr. Bailey did not receive $290,000 "in return for" his payments to Mr. Dorsey and Mr. Paitsel. Rather, he received these funds after negotiating two separate arm's-length deals that did not involve Ms. Dorsey or Mr. Paitsel at all: one deal with the tenant to buy the TOPA rights and one deal with another real estate developer to sell those rights. This causal chain does not meet the standard in §2C1.1(b)(2). *See, e.g.*, *United States v. Edwards*, 496 F.3d 677 (D.C. Cir. 2007) (upholding bribery sentence of District government asbestos inspector who told company he would withhold permit for asbestos removal unless company paid him $10,000).

**Third**, the government must prove that Mr. Bailey would not have obtained the

profit from these two real estate deals without his payments to Ms. Dorsey and Mr. Paitsel. In *Ring*, for example, the defendant was a lobbyist who had provided sports tickets and other benefits to public officials. The government contended that the "benefit received" by Mr. Ring (or his clients)was over $14 million, resulting from the value in various government benefits, such as earmarks, increased government contract awards, and appropriations.[1] The court was troubled by the government's sentencing position that relied on "the attenuated, if not nonexistent, causal link between these appropriations and corrupt lobbying." *Id.* at 377. The government's benefits calculation was "premised on aggregating the value of any appropriations that can be directly traced to Kevin Ring's lobbying efforts." *Id.* That was not a sufficient showing of causation. A court "must take care to take into account benefits that would have been received in any event." *Id.* In that case, the government had "presented little to no evidence" tying at least half of the $14 million figure "to any corrupt payments by Ring or his co-conspirators." *Id.* Ultimately, the court was unpersuaded that the government had met its burden to prove a "reasonable estimate of the 'value received or to be received' in return for the bribes paid by defendant" and declined to increase the Guidelines calculation by any loss amount. *Id.*

Mr. Bailey already knew about the 224 T Street and the 3021 15th Street properties before Ms. Dorsey sent him the offers of sale—either through his access to

---

[1] Specifically, the loss amount proposed by the government was from "1) the $7.3 million increase in the Department of Justice award for the Choctaw Jail, 2) $4.95 million in transportation earmarks that were funded by the House due to Albaugh's intervention, and 3) $400,000 in appropriations for a water project study assisted by Rep. John Doolittle. (Dkt. No. 257 at 10–13.)." *Ring*, 811 F. Supp. 2d at 376.

the MLS, from email blasts from commercial real estate firms, from conversations with selling brokers, or from the list of sales sent out by DHCD each week. Exhibits 200, 203, 205, 208 (DHCD weekly listing of properties for sale). The TOPA statute required the building owners to post the offer of sale publicly at the properties and the posted notices included the tenant names. 10/3/22 Tr. at 167-68 (testimony by commercial real estate broker Dennis Cravedi that TOPA notices would be posted "by entrances, points of egress, mailboxes, and typically hallways on different floors"; that "if someone went up to that TOPA notice that we're looking at in the photo, could they flip through the pages" and "read the tenant names" on the notice); *see also* Exhibit 223A, 223B (photos of offer of sale postings at buildings). Information on the internet or through commercial databases would allow a developer like Mr. Bailey to take the tenant names from the public postings and find their contact information.[2] In the end, the government has no evidence to counter the fact that the benefit to Mr. Bailey from buying and then reselling the TOPA rights for these two particular properties "would have been received in any event." *Ring*, 811 F. Supp. 2d at 377; *see also United States v. Anderson*, 517 F.3d 953, 964 (7th Cir. 2008) (excluding value of specific real estate development ("Misty Creek") as part of bribery loss calculation because "even if the

---

[2] Immunized government witness Alvin Dunn testified that he knew how to "skip trace" a person, which meant using paid commercial databases to "develop[] information on a person that you're seeking to get." 9/29/22 Tr. at 68. This information included the person's telephone number and address and could even include the person's social security number or credit report. Id. at 68, 73; see also id. at 74 ("when asked what information Mr. Dunn could obtain through whitepages.com, explaining, "[j]ust pretty much their current address, past address, current telephone numbers, past telephone numbers, and relatives.").

payments Anderson made to Meisch can be considered as relevant conduct, they cannot be connected to Misty Creek" and noting that "Misty Creek was basically completed by the time of the earliest alleged bribes").

This leaves only one permissible loss calculation under §2C1.1(b)(2): using the "value of the payment[s]." At trial, the government offered evidence that Mr. Bailey paid Ms. Dorsey $7,000 and paid Mr. Paitsel $10,600.[3] Thus, the maximum total "value of the payment[s]" is $17,600. Using the table in §2B1.1, this corresponds to 4 levels rather than the proposed 12 levels, resulting in a Total Offense Level of 24, rather than 32, resulting in an advisory Guidelines range of 51 – 63 months.

### B. The Government "Later-Earned Profit" Argument is Only Applicable to a Different Offense and Guideline Provision

The government's loss theory seems to be that if Mr. Bailey bribed Ms. Dorsey for information and then used that information to engage in financial deals with third parties that earned him a profit, then the loss amount is that later-earned profit. The Guidelines do permit such a causation theory *but only for insider trading*. The insider trading Guideline is Section 2B1.4. There, the Guidelines direct the Court to calculate the loss as the "gain resulting from the offense." §2B1.4(b)(1). This is a much broader causation standard than the four categories of loss defined in §2C1.1(b)(2).

---

[3] Mr. Bailey contested at trial that he paid Mr. Paistel any amount for the information Mr. Paistel provided. Mr. Bailey testified that he gave Mr. Paitsel $2500 in cash, not $4100, and explained that it was to thank Mr. Paitsel for helping Mr. Bailey's family a few years earlier when they were struggling financially. 10/3/22 Tr. at 125-26 ("I mean, he carried my family. He helped me a lot. He lived in my home. He bought groceries. He did everything that a friend could have ever asked for."). Mr. Bailey also testified that he gave Mr. Paitsel the $6500 to help Mr. Paitsel renovate his basement. *Id*. at 124, 152.

The Commentary to the Guideline in the insider trading context specifically permits the Court to look to profit later earned though use of the wrongfully-obtained insider information, explaining that "the gain, i.e., the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information, is employed instead of the victims' losses." §2B1.4 comment. (backg'd). The government cannot pick a favorable loss causation theory from anywhere in the Guidelines Manual. Rather, it bears the burden to prove the loss amount contained in §2C1.1. Because the only category of loss that falls within that Guideline is the amount of Mr. Bailey's payments, the loss amount is (at most) $17,600.

### C. The Total Offense Level Should Be Reduced by Two Levels Because of an Amendment to the Guidelines

On August 24, 2023, the Sentencing Commission voted to promulgate a new §4C1.1, which provides that the offense level should be decreased by two levels for those defendants (1) whose criminal history calculation is zero, and (2) who does not meet certain aggravating factors. Mr. Bailey's criminal history level is zero and he does not meet any of the aggravating factors identified in §4C1.1. As a result, his offense level should be decreased by two levels.

Even though the amendments have an effective date of November 1, 2023, the Court must follow them. *See* 18 U.S.C. § 3553(a)(4) (courts follow Guidelines "issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28).").

### D. The D.C. Circuit Has Raised Concerns about Use of the "Official Duty" Prong of Section 201 to Seek an Excessive Punishment for Sharing Public Information

The Court should take into account the concern with imposing a lengthy sentence under the "official duty" prong of Section 201 in *Valdes v. United States*, 475 F.3d 1319, 1327 (D.C. Cir. 2007). The court of appeals acknowledged that it had not "yet had occasion to construe 'official duty.'" *Id*. It noted that reading the statute too broadly "would punish the disclosure of public information more severely than other, more targeted statutes punish the disclosure of confidential information." *Id*. at 1329. For example, the D.C. Circuit noted that it permitted the imposition of a sentence far greater than that permitted by 18 U.S.C. §1905, which allowed only a 1-year maximum penalty for "disclosing certain types of confidential information acquired by an officer in the course of employment."). The government proposes a 10-year sentence, and Probation recommends a 4-year sentence, for Mr. Bailey's receipt of *public* information, raising the precise concern that *Valdes* raised. This is another reason why the Court should impose a maximum sentence of a year and a day.

### III.   Legal Standard

The Section 3553 factors suggest a sentence far lower than the guidelines range. By virtue of its recommendation of a substantial variance, the U.S. Probation Office even recognizes the advisory guideline range is not warranted in this case.

Determining the proper sentence in a federal criminal case is within the discretion of the district court. The Court's discretion is to be exercised upon consideration of the purposes of sentencing in light of the particular case and defendant before it. The sentencing guidelines cannot be used as a substitute for a

sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors set forth in 18 U.S.C. §3553(a). *Nelson v. United States*, 555 U.S. 350 (2009); *Spears v. United States*, 555 U.S. 261 (2009). The Court's decisions in *Nelson* and *Spears* build upon its earlier decisions in *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), establishing that the sentencing guidelines are simply an advisory tool to be considered alongside the other § 3553(a) statutory considerations.

Factors a district court considers include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the kinds of sentences available, (3) the guidelines range, (4) the need to avoid unwarranted sentencing disparities, (5) the need for restitution, and (6) the need for the sentence to reflect: the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to the defendant and others, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. See 18 U.S.C. § 3553(a). The Court must weigh each of these factors when determining the appropriate sentence with the least amount of imprisonment necessary pursuant to §3553(a). *Id.*

As another U.S. district court has recently observed, "[t]he sentencing of defendants in federal court is such a common occurrence that it is important to occasionally pause and remember what is at stake. A human life, designed both by nature and our nation's Constitution to live free and pursue happiness, is taken away from family and familiar surroundings to serve days, months, years, or a lifetime in

a prison cell." *United States v. Faison*, No. GJH-19-27, 2020 WL 815699, at *1 (D. Md. Feb. 18, 2020). And, "[f]or him, every day, month and year that was added to the ultimate sentence will matter. The difference . . . between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family." *Id.*

This concern exists "whether it is the newly incarcerated individual's first experience with incarceration or just the most recent," because regardless, "he must quickly adapt to the stunning loss of freedom and privacy while struggling to maintain any sense of his personal dignity." *Id.* Thus, the court continued, "it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence." *Id.*

## A. Nature and Circumstances of the Offense

In the District of Columbia, the Tenant Opportunity to Purchase Act (TOPA) provided tenants with the right of first refusal to purchase their residence should the owner decide to sell the rental property.  Under TOPA, tenants may sell or assign their rights of first refusal to any third party.

In these transactions, the D.C. Department of Housing and Community Development (DHCD) is charged with maintaining notices and offers to purchase the properties. There is no dispute that the documents are public documents. Nevertheless, pursuant to an unwritten policy, the DHCD treated the documents as confidential, yet distributed the documents to non-governmental public service organizations, whose stated purpose was to protect tenants' rights.

In essence, the Indictment alleges that Brian Bailey paid a D.C. government employee for access to the public documents in contravention of DHCD's unwritten policy of keeping the confidential. The Indictment also alleged that Bailey paid his friend and former real estate co-investor for property and tenant information that person accessed on a governmental database while working for the Federal Bureau of Investigation.

## B. History and Characteristics of Brian Bailey

Fifty-seven individuals have written letters to the Court describing the Brian Bailey they know, in many cases for several years. Because he has been so intimately involved in his community and the commercial real estate business, many of the individuals know him in that context. The consistent sentiment expressed is one of strong family values, caring for his community, and generosity to others without seeking anything in return. The letters, which are listed in alphabetical order, provide a glimpse as to the character of Brian Bailey.  An asterisk (*) denotes letters specifically referenced in this memorandum.

1. Bruce Adams
2. Dan Adler
3. Len Adler
4. John Burns*
5. Ashish Amin
6. Jerome Bailey
7. Mary Bailey
8. Marquis Bailey*
9. Michael Brewer
10. Marcellous Butler
11. Curtis Chambers
12. Nigel Crayton
13. LaMarr Datcher*
14. Delonta Dickerson
15. Ronisha Dickerson
16. Ayana Douglas
17. Felipe Ernst
18. Philip Finelli*
19. Bruce Finland*
20. Robert Gottschalk*
21. Delenis Greene
22. Avery Harwell*
23. Harry Hawkins
24. Lyric Hawkins
25. Justin Hill
26. Timothy Hill
27. Jonathan Hoppe
28. Trian Johnson
29. Courtney Jones
30. James Killette
31. Joelle Lawrence
32. Julius Lofton

33. Adolphus Miner
34. Ronald Moten
35. Lolita Munir*
36. Dwight Nelson
37. Jennifer Oberg
38. Corbin Patterson
39. Ronaun Perez
40. Jeffre Powell
41. Anthony Quildon
42. Alvin Rice
43. Dion Robertson
44. Ian Ruel
45. Herbert Schwat

46. David Snider
47. Max Snider*
48. Isaiah Solomon
49. Reginald Speight*
50. Zach Stone
51. Tiarra Taylor
52. Darrell Tucker
53. Leon Waddy
54. Terrence White
55. Benjamin Wilson
56. Corey Woodfolk
57. Marty Wynn

<u>Marquis Bailey</u>.

"Brian Bailey is not my biological father [but] … He took care of me as if I were his own. He loved me and poured into me. He adopted me and gave me his last name, prior to him marrying my mother. He provided a roof over my head and raised me to always do the right thing. He taught me the importance of honesty, integrity, and hard work. My father's background is contrast to mine. He was born and raised in D.C. when it was referred to the "Murder Capitol of the World!" He grew up in a rough neighborhood, came from a broken household, and from parents who divorced when my father was 7 years old. I have no clue what that feels like. I was raised in a home with my siblings, and we all lived under one roof. My parents are still happily married."

"My father has done extraordinary things for his family and the community. While he now has accomplished a lot financially, he hasn't allowed it to change the root of who he is. He continues to invest in under-served communities. I've watched him beg for money from banks and invest it into the poorest neighborhoods in the city. That taught me a valuable lesson about not passing judgment on anyone."

"He is graduating with a BS Degree in December in Business Management. I also want to make you aware that he has applied to Georgetown, Harvard, and Johns Hopkins University Graduate School to pursue his master's in real estate … I'm certainly proud of him, and I know he is anxious to make the court and community proud too. Please accept my deepest apologies on his behalf for this situation."

<u>John Burns, Len Adler and Dan Adler</u>.

These gentlemen are local real estate lenders who have worked with Brian for the last five years.  John Burns has known Brian over the past ten  years and considers  him a business partner and friend.

They describe Brian as a relentless hard worker and a patient and involved father. They note Brian has renovated over 100 housing units in several D.C. neighborhoods, most leased to affordable housing programs "that serve a critical need in our community."  And as stated earlier, Brian goes above and beyond in insuring tenants receive high grade rental units.

<u>LaMarr Datcher</u>.

An associate director with Feldman Ruel Urban Property Advisors, he is a native Washingtonian and raised in Ward 8. Brian has served as a mentor to Datcher, "with no expectation of anything in return or benefit to himself." "[L]earning from someone who looks like me and is from the same city I come from is an incredible experience." A proud graduate of Colgate University and Valpariso Law School, Datcher notes "Brian's value to society as hundreds of families and the local economy, via housing and jobs, benefit from his acts and initiatives as a real estate investor and developer focused primarily on multifamily housing!" He respectfully requests

this Court to exercise its discretion and impose a "reduced sentence or alternative sentencing options [which] would not only allow him to continue making a positive impact on our society but would also ensure that his family and business are aligned with its leader while he continues to provide quality, affordable housing to many."

Philip Finelli.

Mr. Finelli has owned and managed commercial real estate in the District for many years. Hie experience "provides him a unique prospective with regard to Mr. Bailey."

In 2019, Finelli was managing a limited liability company that owned 1829 13th Street, NW. Despite having been skeptical of dealing with Brian after learning of his criminal record from long ago, he explained that "I decided that Mr. Bailey really was an old fashion 'hand shake' developer that could be trusted to keep his word. I was impressed with all that he had accomplished notwithstanding his transgressions as a young adult and the charges he was then facing. Although we had received offers from other developers, I was convinced that Mr. Bailey was the best fit to be our buyer."

Although the closing was delayed multiple times, and the standard practice in the industry is to not allow a buyer to take possession of a building until settlement, Finelli and his partners allowed Bailey access to develop the property and loaned him $1 million, which he paid back "faithfully".

"As a result of my numerous interactions with Mr. Bailey, his family, staff, employees and contractors I have been able to develop an objective opinion of Mr. Bailey which is quite different than the person I read about in the winter of 2019 …

His goal is to make each one of his family members independent and successful, especially through various educational opportunities."

"Job sites are a microcosm of our society. I have had the opportunity to visit many of Mr. Bailey's development projects and have observed his interaction with contractors, sub-contractors and laborers. His demeanor was always friendly and he always was willing to chat with each individual."

"Mr. Bailey's life is a success story worth repeating as often as possible, especially among young women and men of color. He is the missing mentor in the lives of enumerable women and men in our society."

<u>Bruce Finland</u>.

Mr. Finland, having known Brian for several years, states that they have worked "in some of the more challenging areas of the city, and I consider myself to be a reasonably good judge of landlords and their operations. On numerous occasions I have witnessed Brian converting unsafe, substandard housing into attractive and safe properties that help bring stability to these areas. Not many developers are willing to make the financial commitments needed for our most vulnerable residents, Brian certainly has."

"In summary, I consider Brian Bailey an important resource for meeting the District's housing needs. Many families will have a safe roof over their heads tonight thanks to him."

<u>Robert Gottschalk</u>.

Mr. Gottschalk, an attorney in D.C. and current general counsel to a real estate investment company, got to know Brian in 2018 and notes "I have had the privilege

to become Brian's friend." He notes that, "[a]s an officer of the court I respect our legal system, and along with it I respect Brian's conviction. I also respect your role as the sentencing judge and the importance of giving you additional context and information in the aid of your weighty and impactful service."

In that regard, Mr. Gottschalk states,

Brian and I are not from similar parts of the country, and our backgrounds and lifepaths could hardly seem more divergent. But ever since our paths crossed, I have admired him. Brian loves God, loves his country, and deeply loves his family. He also embraces a work ethic that is motivating and inspiring and he shows admirable leadership within his company. These general traits and his gift for knowing the right time to offer a kind word or write an inspiring note, make Brian a good person, and the kind of citizen we want in our community and on our streets. Like every person, Brian is much more complex than you could possibly know from the Record of the case or learn from observing him in the courtroom.

<u>Avery Harwell</u>

Mr. Harwell has known Brian for ten years in his capacity as a former volunteer football coach, baseball coach, and mentor for local youth sports organizations. He knows Brian as a devoted father, staunch advocate for the young men that he coaches, and as a mentor. "Eighty percent of the young boys we coached and mentored lived in challenging neighborhoods in SE Washington, DC where role models and opportunities to thrive within their boundaries are exceedingly rare due to economics and personal circumstances." He and his wife have witnessed firsthand Brian's tireless dedication in coaching the kids the fundamental basics of football, teaching them the importance of teamwork, and giving his time, energy, and financial resources in service of their "developmental growth to becoming well rounded, respectable young men. Brian's passion for helping, uplifting people is what we most

admire and respect about him. His unwavering commitment to rebuilding broken neighborhoods in the city he grew up in is humbling."

Lolita Munir

Ms. Munir speaks about how Brian's work mentoring youth has left an indelible mark on countless young lives.

Brian's ability to connect with and empower these young individuals is truly commendable. He goes above and beyond to instill in them a sense of purpose, self-esteem, and the belief that they can achieve anything they set their minds to. Brian's mentorship has undoubtedly helped shape the leaders of tomorrow.

His tireless efforts to feed the homeless demonstrate his genuine compassion for those less fortunate. Brian's commitment to providing not just food but also hope and dignity to the homeless population has had a profound impact on improving their lives. He understands that a meal can provide not only sustenance but also a glimmer of hope, and he consistently delivers on that understanding.

Max Snider

Mr. Snider is a commercial real estate lender and a former Vice President of Commercial Real Estate Lending at Capital Bank in Rockville, Maryland. Having had the opportunity to closely interact with Brian, Mr. Snider states the professional relationship has grown into a strong and mutually respectful partnership. "Brian is not just a client but also a respected member of our local business community."

Mr. Snider believes Brian's financial responsibility and integrity as a client have been consistently impeccable. He has extended loans to Brian exceeding $15 million. "[Brian's] financial stability and reliability are a testament to his strong character and his commitment to his business and community."

Reginald Speight

Mr. Speight serves as the Coordinator of School Culture position at Capital City

Public Charter School in Washington, D.C. He has over 25 years of experience in education and has known Brian for 43 years.

Brian has supported Mr. Speight's efforts to empower youth and strengthen their community. Brian has consistently supported Speight's initiatives as a guest speaker and generous financial contributor. Brian's presence and words have "inspired countless young individuals and adults to believe in their potential and pursue their dreams … Brian displayed qualities that set him apart - a passion for service and a heart dedicated to uplifting our community."

Darrell Tucker.

A 32 year veteran of the financial services industry and a State Farm agency owner since 2010, Mr. Tucker has spent many hours with Brian.  Mr. Tucker recounts the "joy [Brian] has provided to residents when they have been afforded the opportunity to move into a newly renovated apartment versus the terrible conditions the previous owner provided. He has been a true blessing to many under privileged areas." In lieu of incarceration, he asks the Court to impose some sort of community service, such as funding at-risk youth programs.

Marty Wynn.

Mr. Wynn speaks about Brian's "unwavering dedication to his community and his active involvement in various outreach programs. He is a beacon of hope for many, especially in communities that often face disproportionate challenges." Mr. Wynn discusses Brian's ability to overcome obstacles and commends Brian for his determination to make a positive difference in the lives of others.

**C.** **The Need for the Sentence To Afford Adequate Deterrence**
**to the Defendant and Others and to Protect**
**the Public from Further Crimes of the Defendant**

To achieve the aim of general deterrence, "social science conclusively finds that certainty matters more than severity." Brian Jacobs, The Cost of Affording Deterrence, *Forbes* (Nov. 16, 2021). "[T]he vast majority of people who are committing crime are not particularly forward-looking. So adding on five or ten years to an already long prison sentence simply doesn't have much of an effect on their behavior today." *Id*. A 2016 bulletin by the National Institute for Justice, a division of the U.S. Department of Justice, made this plain: "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment." U.S. Department of Justice, *Five Things About Deterrence* 1, National Institute of Justice (June 2016). Additionally, the NIJ report provided: "[P]rison sentences, (particularly long sentences) are unlikely to deter future crime" and that "increasing the severity of punishment does little to deter crime." *Id*.

Thus, while the government urges that more than a decade in prison is required here in large measure to dissuade others from violating the law, in reality, what they are arguing for is a far "greater than necessary" punishment. There is no reason to believe that a sentence of ten years (or even the four recommended by U.S. Probation) in prison for a non-violent offender, a significant sentence by any reasonable metric, would somehow be seen by a would-be offender as worth the risk. What such an offender would be worried about was going to jail, period.

Moreover, the Court need not be concerned about any future criminal conduct from Brian Bailey. The conduct at issue occurred between February 2016 and August

2018. Brian Bailey was arrested on April 25, 2019 and for the last four and a half years has been compliant with all conditions of supervised release. Moreover, Brian's age of 54 years, a Criminal History Category I reflecting zero Criminal History points, financial resources, network of friends and business associates who have stepped forward to support him, and recent commitment to obtain his undergraduate business degree and pursue a master's in business all support the proposition that he will not reoffend.

## IV.   There Is No Restitution Because There Are No Victims of the Offense Conduct

Probation did not recommend any restitution and found that "there is no identifiable victim who suffered a monetary loss as a result of the criminal conduct." PSR ¶ 55. The government nonetheless argues that when Mr. Bailey "paid certain tenants a pittance for their TOPA rights without explanation he was defrauding them of their property." Dkt. 281 at 12. It asks that the Court order Mr. Bailey to pay $40,000 in restitution to one of the tenants whose TOPA rights he purchased.

This position has no support in the record whatsoever as the government never offered any evidence at trial that the amount that Mr. Bailey paid the tenants for their TOPA rights was below market value or that he defrauded them in the process. He was not charged with defrauding them. Moreover, the TOPA statute makes clear that a tenant may sell his or her TOPA rights "to any party, whether private or governmental" and that the sale "may be for any consideration which the tenant, in the tenant's sole discretion, finds acceptable." D.C. Code § 42-3404.06. The government may not now substitute its judgment to question the consideration that the tenants found acceptable at the time, particularly where there is no evidence that

25

Mr. Bailey deceived them. Indeed, the tenant at issue, Patrick Brown, testified at trial and never suggested that he was defrauded or deceived in any way.[4]

## V.   Conclusion

Based upon his personal history and characteristics, the nature and circumstances of the offense, his lack of criminal history, and his unlikelihood of recidivism, Brian Bailey respectfully requests that the Court impose a sentence of no more than a year and a day, with half of the time served in home detention. The sentence is "sufficient, but not greater than necessary," to achieve the legitimate purposes of sentencing. 18 U.S.C. § 3553(a).

September 29, 2023                           Respectfully submitted,

/s/ Sara E. Kropf                           /s/ Pleasant Brodnax
Sara E. Kropf (D.C. Bar 481501)             Pleasant S. Brodnax, III
KROPF MOSELEY PLLC                          1701 Pennsylvania Avenue, NW
1100 H Street NW                            Suite 200
Suite 1220                                  Washington, D.C., 20006
Washington, DC 20005                        (202) 462-1100
(202) 627-6900                              pleasant.brodnax@gmail.com
sara@kmlawfirm.com

                                            *Counsel for Defendant Brian Bailey*

---

[4] Mr. Brown was the sole tenant who lived at 224 T Street NE, one of the two properties that the government asks the Court to consider as part of the loss calculation. Mr. Brown testified that a fire broke out in the building, and he lost all his possessions and home. 9/29/22 Tr. at 122-23. After the fire, Mr. Bailey contacted Mr. Brown to offer him $500 for his TOPA rights and Mr. Brown agreed, signing a written agreement with Mr. Bailey to that effect. Ex. 105D. Mr. Bailey paid Mr. Brown the agreed-upon amount, as permitted by the TOPA statute. Mr. Brown did not testify at trial that he felt tricked or defrauded by Mr. Bailey in any way.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 29, 2023, I caused a copy of the foregoing Defendant Brian Bailey's Sentencing Memorandum to be served on all counsel of record via the Court's CM/ECF system.

<u>/s/ Pleasant S. Brodnax, III</u>